UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RICHARD RODRIGUEZ LARIOS,

Petitioner,

v.

CLARK DUCART, Warden,

Respondent.

No.  1:13-cv-00095-AWI-SKO  HC

**FINDINGS AND RECOMMENDATIONS
TO DENY PETITION FOR WRIT OF
HABEAS CORPUS**

## I.     INTRODUCTION

Petitioner Richard Rodriguez Larios ("Petitioner") is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, presents five grounds for habeas relief, concerning ineffective assistance of counsel, the admission of evidence, and cumulative error.  The matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.   For the reasons below, the undersigned FINDS AND RECOMMENDS that the Court DENY the petition.

## II.     BACKGROUND

### A.     Procedural History

Petitioner was charged with three counts of attempted murder, Cal. Pen. Code §§ 664/187, subd. (a), premeditated and deliberate, *id.* at § 664, subd. (a), and a fourth count for discharging a firearm at an occupied vehicle, *id.* at § 246.  The information further alleged enhancements for

personally discharging a firearm, *id.* at § 12022.53, subds. (c) and (e), and for commission of a crime in association with or for the benefit of a criminal street gang, *id.* at § 186.22, subd. (b)(4). On March 9, 2010, Petitioner was sentenced to an aggregate sentence of 54 years to life, as follows:  on count 1, life with a minimum parole eligibility of seven years, plus 20 years for the gun enhancement; on count 2, life with a minimum parole eligibility of seven years, plus 20 years for the gun enhancement, to run concurrently; on count 3, life with a minimum parole eligibility of seven years, plus 20 years for the gun enhancement, to run concurrently; and on count 4, 15 years to life, plus 20 years for the gun enhancement, stayed pursuant to Cal. Pen. Code § 654. The Court further imposed miscellaneous fines, fees, and assessments and awarded Petitioner presentence credit for 548 days served.

Petitioner filed a timely notice of appeal to the Fifth District Court of Appeals (hereafter "the Fifth DCA") on March 15, 2010.  On August 19, 2011, the Fifth DCA directed the trial court to strike the 20-year Cal. Pen. Code § 12022.53 enhancement imposed and stayed on count 4 and affirmed the judgment in all other respects.  (Lodged Document ("LD") 13.)  Likewise, his petition for review in the California Supreme Court was summarily denied.  (LD 14; 15.)

On January 22, 2013, Petitioner filed a federal petition for writ of habeas corpus, which is currently before this Court.  (Doc. 1.)

**B.     FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the California Court of Appeal's unpublished decision[1]:

*FACTS*

On October 20, 2008, Stephanie G. and her friend, Irving Rodriguez, went with Juan Saucedo to a local convenience store and gas station in Saucedo's car, a black Nissan Maxima.  Rodriguez drove; Saucedo sat directly behind Rodriguez; and Stephanie G. sat in the front passenger seat. Rodriguez and Saucedo were both Southern (or Sureno) gang members; Stephanie G., 17 years old and pregnant, was not a gang member.

At the gas station, Saucedo went inside to pay for the gasoline while Rodriguez pumped the gasoline. Stephanie G. remained in the car.

---

[1]     The Fifth DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the Court adopts the factual recitations set forth by the Fifth DCA in *People v. Richard Larios*, No. F059866 (Sup. Ct. No. VCF211993C), 2011 WL 3655165 (Cal. Ct. App. Aug. 19, 2011).

While they were at the gas station, another car, a Cougar pulled up with three people inside.  One person from the Cougar went inside while another pumped the gasoline.

When Saucedo came outside from paying for the gasoline, he appeared to Stephanie G. to be somewhat angry.  He stated that the person from the Cougar who went inside the store said to Saucedo, "What's up Ene[?]" Saucedo responded, "What's up Ese[?]"  Other testimony established that Northern (or Norteno) gang members identified themselves with the letter N or "Ene" in Spanish, and Southern gang members identified themselves with the letter S or "Ese" in Spanish.  Addressing a Northerner as a Southern gang member by saying "What's up, Ese?" and likewise addressing the Southern gang member as a Northerner by saying "Whats up, Ene?" was a sign of disrespect.  Stephanie G., who knew of her companions' gang affiliation, was concerned by the confrontation.

When Stephanie G. and her companions left the gas station, the Cougar followed them; it continued to do so when they turned onto another street.  When the Maxima stopped at a stop sign, the Cougar came up alongside the left side of the Maxima, and shots were fired at the Maxima from that direction.

Stephanie G. ducked after the first shot, and did not see where the Cougar went. Stephanie G. received cuts in her arm from glass shattered by the shooting.

At approximately 6:30 p.m. that night, Tulare City Police Officer Jeremy Faiman was on patrol on R Street near Bardsley Avenue when he heard approximately five gunshots.  Thinking someone might be shooting at him, Officer Faiman looked to his left and right before directing his attention ahead, from where he believed the shots originated.  There, he saw a black Nissan Maxima, which turned out to be Saucedo's car.

Believing the Maxima was involved in the shooting, Officer Faiman sped up to follow the vehicle.  Eventually, Officer Faiman and other officers effected a felony stop of the Maxima.

During the stop, Rodriguez yelled that he could not show his hands because the window had been shot out, and that there was a pregnant female in the car, who was bleeding.  Saucedo yelled that he was the victim, and that they had just been shot at.  Sometime during the stop, Saucedo told Stephanie G. to say that they were just going to the store; later, at his suggestion, she lied to the police, saying that they were there to cash a check.

The occupants of the Maxima were called out of the vehicle one by one, and handcuffed, while Officer Faiman had his weapon drawn.  After the occupants were removed from the car, the officers, searched the car for weapons, but found none.

Officer Faiman then spoke with Juan Saucedo, who appeared "nervous" and "upset."  Saucedo stated that he was at the gas station when another car pulled in behind him; the occupants of the car were "mad dogging" him.  He left the gas station and was at a stop sign on Cedar and R Street when the other car pulled alongside him and one of the passengers began "blasting" on him.

3

Irving Rodriguez told Tulare City Police Officer Michael Melikian that he had left the gas station and was at the stop sign when he heard four or five gunshots. He noticed his car was being shot at, and he sped away. Immediately afterward, he was stopped by the police officers. He did not say another car shot at him.

Because of the cuts on her arm and because of her pregnancy, Stephanie G. was taken by ambulance to Tulare District Hospital. At the hospital, she told Tulare City Police Officer Bill Robertson that they were at gas pump at the gas station when a silver or gray Cougar pulled alongside the driver's side of Stephanie G.'s car, and "they exchanged dirty looks with herself and the occupants of the car."

Stephanie G. then related that when they stopped at Cedar and R Street, the same car they had seen earlier pulled alongside Stephanie G.s vehicle. Stephanie G. heard a booming noise and ducked down. She then heard four additional shots.

Approximately one or two hours after the shooting, Tulare City Police Department Detective Jesus Guzman spoke with Rodriguez. Rodriguez stated that, while he pumped gasoline in the car, three Northern gang members "mad dogg[ed]" him and Saucedo. One was Hispanic, approximately five feet seven inches tall, with a shaved head and a mustache. Another was Hispanic, approximately five feet seven inches tall, had a heavy-set build, had a shaved head, and was dressed in black. The third person was five feet eight inches to five feet nine inches tall with a medium build, and wore a gray hooded sweatshirt. When arrested in November of 2008, appellant had a shaved head, a mustache, and a goatee.

When Rodriguez left the gas station, he noticed the other vehicle, a silver or gold-colored Cougar, followed him. When Rodriguez stopped at a stop sign, the Cougar came alongside the driver[']s side of Rodriguez's car and shots were fired.

That same night, Rodriguez identified appellant in a photographic lineup, as did Stephanie G. However, Stephanie G. was unable to identify codefendant Zuniga in a photographic lineup, and instead identified another, unknown person. At a previous hearing in the present case, Stephanie G. identified both appellant and codefendant Zuniga.

A surveillance video at the store showed Saucedo and Zuniga inside the store. Other views showed Saucedo and Zuniga outside the store.

After the shooting, on October 22, 2008, Tulare City Police Officer Priscilla Solis examined the Maxima. There were four bullet holes in the vehicle: two near the window of the rear driver's side door, one in the center of the rear window, and one on the top right portion of the window. The front driver's side window was shattered. There were bullet fragments inside the car behind the front passenger side seat and just behind the headrest of the rear passenger side seat.

On that same day, Officer Solis assisted in a search of a residence on Amber Street in Tulare. There, she found marijuana, court paperwork with appellant[']s name, some other pictures, and an address book.

On October 24, 2008, Tulare City Police Officer Daniel Dohner was dispatched to an alley on the 700 block of East Ventura because fire department personnel had

found a burned-out vehicle.  At the scene, he found an "early model Mercury Cougar" although it was impossible to tell the color of the vehicle because of the fire.  The license plate number was 5DKE893.

Earlier, in July of 2008, Tulare City Police Officer Misael Aguayo came into contact with appellant while appellant was near a gold Mercury Cougar, with the same license plate number as that of the Cougar Officer Dohner found on October 24, 2008.  Similarly, on September 29, 2008, Detective Guzman encountered appellant and codefendant Zuniga in a "brownish silverish color" or gold color Mercury Cougar with the same license plate number as that found by Officer Dohner.  Appellant drove the car and codefendant Zuniga was the front passenger.

Both appellant and codefendant Zuniga were at a residence on Becky on November 18, 2008.  Appellant was seen leaving the residence, and Zuniga was at the residence when officers executed a search warrant.

Tulare City Police Officer Tony Espinoza was part of a "take-down unit" for a team conducting surveillance at the residence on Becky.  Appellant was a passenger in a Ford Mustang, which Officer Espinoza followed.

Officer Espinoza stopped the vehicle; when he did so, appellant "took off running."  Officer Espinoza chased appellant over a three-foot concrete wall and two six-foot wooden fences while repeatedly ordering him to stop.  Eventually, when ordered to stop at gunpoint, appellant complied.

Raul Luna lived at the Becky address in November of 2008.  At trial, he denied being a gang member, although he admitted sometimes associating with Northern gang members. However, Detective Guzman opined that Luna was a Northern gang member based "on his association" and on Detective Guzman's knowledge that Luna came from Salinas and went by the nickname "Salas." Detective Guzman spoke with Luna on November 18, 2008. Luna stated that Zuniga and appellant had been staying at the house approximately a week because they were on the run from the police because of a shooting.[2]

> FN 2.     The trial court instructed the jury that it was to consider Luna's belief that appellant and Zuniga had been involved in a shooting only for the purpose of why he was letting them stay there.   "It's his belief.  There's no evidence that either one of these defendants told him that."

At trial, Stephanie G. could not identify the person who pumped the gasoline.  She stated that no one "mad dogg[ed]" her that night, although she noticed someone from the Cougar "looking over at the cars."  She stated, "I don't know if they was looking at a mean way or. . . .  They was just looking."

Rodriguez initially refused to testify, even under a grant of immunity and under the threat of being held in contempt.  He was held in contempt and placed in custody.

Later, Rodriguez testified, admitting that he had six felony convictions and had previously served time in prison.  He testified he did not notice anything out of the ordinary at the gas station until Saucedo told him something was happening.  The people, males, were a few pumps away, but Rodriguez did not particularly look at them, and was "[n]ot at all" worried.  He testified that he could not

remember the make or color of the car.

Rodriguez testified that when he stopped at the stop sign, he noticed "a couple guys running across the street on my left-hand side, not running, like not, not doing the [crosswalk]. They were running across the street towards where I was at. And that's when I heard shots fired, you know, so I sped off and there was another car behind us that sped off too. And after that I got pulled over and the rest of the story unfolds on its own." Rodriguez did not recall telling Detective Guzman that the three people at the pump "mad dogg [ed]" him. He recalled pointing out someone in a lineup, and stated, "I might have told him [Detective Guzman] that I was 50-50 positive" with regards to that being one of the persons involved.

Rodriguez was then impeached with the testimony of Detective Guzman, who testified about a statement Rodriguez had given Guzman only an hour after the shooting. Guzman testified that as he was pumping gas into the Maxima, three Nortenos had been "mad dogging" him and Juan Saucedo. When he left the gas station, these same three individuals followed him in a silver or gold-colored Cougar, and when he was heading north on R Street and stopped at a stop sign at Cedar Street, "the Cougar that was behind them came along the driver's side and shots were fired." Rodriguez told Guzman he "believed it happened because of him and his friend were southern gang members and the other subjects were Norteno gang members." There was no mention in Rodriguez's earlier statement of him having seen anyone on foot at the scene of the shooting. Guzman met with Rodriguez a second time about an hour after the first meeting (i.e. about two hours after the shooting), and at that time Rodriguez "within a couple seconds" identified a picture of appellant in a photo lineup shown to him by Guzman.

At trial, Raul Luna testified that in November of 2008, appellant and Zuniga were not staying at his house, but "[i]f they needed a spot to stay, they could come over and stay. That's about it." They did not stay even a week there. Luna denied telling Detective Guzman that they had stayed there a week, and testified that neither appellant nor Zuniga ever said they were involved in a shooting.

The parties stipulated that Detective Guzman was qualified to testify as an expert on Northern and Southern gangs in the present case. Given a hypothetical similar to the evidence presented in the present case, Detective Guzman opined that the crime was gang-related. He opined that the crime benefitted the Northern gang by attempting to remove a Southern rival, and promoted the violence the gang was known for by the shooting at rival gang members.

(LD 13, pp. 3-9.)

## III.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme

1   Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

2          "A federal habeas court may not issue the writ simply because the court concludes in its

3   independent judgment that the relevant state-court decision applied clearly established federal

4   law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that

5   a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

6   on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting

7   *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to

8   satisfy since even a strong case for relief does not demonstrate that the state court's

9   determination was unreasonable. *Harrington*, 562 U.S. at 102.

## IV.   DISCUSSION

11         Petitioner alleges: (1) the trial court erred in admitting the statement of Juan Saucedo as an

12  to Officer Faiman as an "excited utterance"; (2) admission of Saucedo's statement violated

13  Petitioner's Sixth Amendment confrontation right; (3) ineffective assistance of trial counsel in

14  failing to object to admission of Saucedo's statement; (4) the trial court erred in admitting the

15  statement of Saucedo to Stephanie G. as an "excited utterance; (5) the jury was improperly and

16  prejudicially exposed to information regarding his juvenile record; and (6) cumulative error.

**A.     Trial Court's Admission of Saucedo's Spontaneous Statements to Officer Faiman**

18         Petitioner first contends that the trial court erred in admitting the statement of witness

19  Saucedo to Officer Faiman as a spontaneous statement exception to the hearsay rule. This

20  contention is without merit.

**1.     The Court of Appeal's Opinion[2]**

22  The Fifth DCA rejected Petitioner's claim as follows:

A.     Facts

[ . . . ]

At argument at the hearing, the prosecutor stated he wanted to have admitted the
statements given to the officers based on the question of what happened. "Each
officer made the same question to each of the witnesses, what happened, and were

---

[2]    Because the California Supreme Court summarily denied review, the Court must "look through" the summary
denial to the last reasoned decision, which is, in this case, the opinion of the California Court of Appeal, Fifth
Appellate District. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

provided a statement, so we would ask that at least the initial what happened and response be admitted under the spontaneous declaration exception and that includes also their demeanor.  The fact that a shooting had just happened.  It's a relatively short period of time."

Appellant's counsel argued, "[T]hese statements were, were given or taken however you want to look at it after the scene was secured, after the people were out of the vehicles.  They were being detained, but any danger was gone.  [¶] They had time to put these people down on the curb.  Look through the vehicle. One of them was even put in the back of a patrol car and while that officer was getting his information [they were] asking what happened.  And so its more of a situation where an officer is doing an investigation and just getting information. Its not these people blurting out statements spontaneously.  They're being questioned, and they're giving answers."  Defense counsel conceded that the initial statements "Hey, we're the victims" might be admissible, but "anything after that they're just being questioned and we just don't let those statements in."

Codefendant Zuniga's counsel joined in these comments.  She agreed that the statements made by the person sticking his hands out the window were spontaneous "but thereafter it does appear this is an ongoing investigation and I would ask the court not to allow the statements in."

The trial court stated:

> "Well what I am focusing on is whether or not these statements were made in response to what happened.  I mean these people are in a car.  The car has just been shot at.  Within moments of the car being shot at, we have the stop and the officer coming out.  They're talking to these individuals who say, "Hey, were, were the victims here," clearly in my mind focusing on the mental state of the speaker and the nature of what happened.  [¶] All these responses were following the officer's question about what just happened, trying to find out what's going on.  They're all saying the same thing.  They're all excited, all nervous, and rightly so after just being in a vehicle that was subjected to gunfire.  I think it's a classic case of excited utterance.  [¶] . . . I find they're all acceptable pursuant to the spontaneous utterance exception to the hearsay rule and I'll allow them all in."

Later, after testimony at trial of some of the officers and after a lunch break, defense counsel stated he did not object to the testimony "because the court already ruled on that, but I just wanted to make it clear on the record that we are objecting to all of those statements. . . ."  The trial court stated, "You've objected. We had the 402.  [¶] . . . [¶] . . . It goes without saying you're not agreeing that this should come in."  The court stated it would note a continuing objection to any statements made by the occupants of the Maxima on a hearsay basis, and that the objections were overruled on the basis of the excited utterance exception to the hearsay rule.

[ . . . ]

//

//

9

C.     Analysis

No one disputes the admissibility of Saucedo's volunteered statement to Officer Faiman "that he was the victim and that they had just been shot at."  It is the rest of what Saucedo said to Faiman -- particularly the statements that a "subject that was in the passenger seat of the brown vehicle started blasting on him," that "blasting" meant "someone shooting at his [Saucedo's] vehicle," and, in response to Faiman's question as to whether the shooters were possibly northern gang members, "Yeah, but they can't shoot for shit," that appellant contends were improperly admitted into evidence.

As for the time elapsed between the shooting and the statements, Faiman testified that about two minutes passed between the time he heard shot shots fired and the time he stopped the Maxima.  About five additional minutes elapsed between the time he stopped the Maxima and the time he asked Saucedo "what happened[?]"  During this time "probably three or four" other officers arrived to assist Faiman.  Rodriguez, Saucedo and Stephanie G. were removed from the Maxima at gunpoint, and were handcuffed and checked for weapons.  Faiman testified that the officers also checked the Maxima for weapons and were "getting names, birthdays, getting identifying information on these people to figure out who they are."  Faiman learned that Saucedo had a warrant for his arrest.

As for Saucedo's physical condition, Faiman said that Saucedo "was obviously upset" and "[h]e was kind of rocking in a rocking motion as to being upset and he just seemed real nervous and excitable."  At this point, Saucedo was sitting either on a curb or in the back of a patrol car.  He and Rodriguez and Stephanie G. were "being detained."  After Saucedo made the statements he made, Faiman asked Saucedo if he could describe the people who shot at him.  Saucedo "pretty much refused to talk to me any further and said he, he knew who it was but he wasn't gonna tell me."

One could view this state of affairs as Saucedo's "reflective powers" predominating over his nervous excitement, and could view his statements as those of a man calculating what to say to the police and what not to say.  One could also reasonably view any nervous excitement on Saucedo's part as stemming not from the shooting but rather from the fact that he was stopped and detained by the police and he knew there was a warrant out for his arrest.  Also perhaps supporting this view was Stephanie G.'s testimony that as the Maxima was being pulled over she asked Saucedo "What do I say?" and Saucedo told her to say that they had been going to cash a check.  Stephanie G. did in fact tell Detective Guzman, about two hours after the shooting, that they had been going to cash a check.  According to Stephanie G.'s trial testimony, this was not true, and they had in fact just been going to get gas.  This particular testimony of Stephanie G. was not presented to the court until after the court had made its ruling on the admissibility of Saucedo's statements.

The evidence could also be viewed, however, as the trial court apparently did, as evidence that Saucedo's nervous excitement predominated over his reflective powers until the point in time at which Faiman asked Saucedo if Saucedo could describe his attackers.  At that point Saucedo's reflective powers predominated,

and from then on he refused to speak further to Faiman.  Given the fact that the trial court's discretion is "'at its broadest'" in making this determination (*People v. Lynch*, *supra*, 50 Cal. 4th at p. 752; *Poggi*, *supra*, 45 Cal.3d at p. 319), we cannot conclude that the court abused that discretion here.  "Where, as here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal. 3d 308, 316.)  Appellant argues "[g]iven that Saucedo undoubtedly was aware of his outstanding warrant status, he had the impetus to lie to the police and fabricate evidence, such as implicating a rival gang, in order to deflect suspicion of his own possible involvement."  Appellant fails to explain what that "possible involvement" was.  It was clear from the bullet holes in the Maxima and from the car's shattered glass that the car Saucedo was riding in had been shot at.  If Saucedo had wished to implicate rival gang members, he could have described them to Faiman.  Instead, he refused to do so.

(LD 13, pp. 10-17.)

## 2.   Analysis

Respondent contends that, as framed and presented herein, Petitioner's claim raises only issues of state law that do not support a claim of federal habeas relief.  (Doc. 14, p. 17.)  The undersigned agrees.

The basic scope of habeas corpus is prescribed by statute.  Subsection (c) of Section 2241 of Title 28 of the United States Code provides that habeas corpus shall not extend to a prisoner unless he is "in custody in violation of the Constitution."   28 U.S.C. § 2254(a) states that the federal courts shall entertain a petition for writ of habeas corpus only on the ground that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States. *See also*, Rule 1 to the Rules Governing Section 2254 Cases in the United States District Court. The Supreme Court has held that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . ."   *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Furthermore, to succeed in a petition pursuant to 28 U.S.C. § 2254, Petitioner must demonstrate that the adjudication of his claim in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28

1    U.S.C. § 2254(d)(1), (2).

2    Petitioner does not allege a violation of the Constitution or federal law, nor does he argue

3    that he is in custody in violation of the Constitution or federal law as a result of the trial court's

4    purportedly erroneous determination regarding the application of the spontaneous utterance

5    exception to the hearsay rule.  Petitioner does not allege that the adjudication of his claims in state

6    court "resulted in a decision that was contrary to, or involved an unreasonable application of,

7    clearly established Federal law, . . . or resulted in a decision that was based on an unreasonable

8    determination of the facts . . . ."  28 U.S.C. § 2254.  Petitioner raises only a state law claim, and,

9    generally, issues of state law are not cognizable on federal habeas review.  *Estelle v. McGuire*, 502

10   U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for

11   errors of state law'") (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *Gilmore v. Taylor*, 508

12   U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not

13   rise to the level of a constitutional violation, may not be corrected on federal habeas").  Moreover,

14   "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant

15   habeas relief." *James v. Borg*, 24 F.3d 20, 29 (9th Cir. 1994).

16   Indeed, federal courts are bound by state court rulings on questions of state law.  *Oxborrow*

17   *v. Eikenberry*, 877 F. 2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).  Further, "the

18   availability of a claim under state law does not of itself establish that a claim was available under

19   the United States Constitution."  *Sawyer v. Smith*, 497 U.S. 227, 239 (1990), *quoting, Dugger v.*

20   *Adams*, 489 U.S. 401, 409 (1989); *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990), *cert. denied*,

21   498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief).

22   As Respondent notes, the Court of Appeal's decision rests entirely on state law.  Moreover,

23   the petition for review filed in the California Supreme Court cites only state law as grounds for

24   error based on admission of the spontaneous utterance.  (LD 14, pp. 3-5.)  State court rulings on

25   the admissibility of evidence generally fall outside the scope of federal habeas relief, which is

26   designed only to remedy violations of federal law.  See 28 U.S.C. § 2254(a); Burgett v. Texas, 389

27   U.S. 109, 113-14 (1967).  This Court is bound by the state court's ruling regarding its

28   interpretation of its own evidentiary rules, and therefore Petitioner's claim for habeas relief due to

the admission of Saucedo's spontaneous statements to Officer Faiman should be denied. *Oxborrow*, 877 F.2d at 1399.

## B. Petitioner's Confrontation Clause Claim under *Crawford*

Petitioner next asserts the trial court's admission into evidence of Saucedo's statements to Officer Faiman violated his Sixth Amendment right to confrontation of the witnesses against him, as set forth in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). To the extent that Petitioner argues a confrontation clause violation, habeas relief *may* be appropriate under certain narrow circumstances. This is not such a case.

### 1. The Court of Appeal's Opinion

The Fifth DCA rejected Petitioner's claim as being procedurally barred, as failing on the merits under *Crawford* and *Davis*, and, regardless, as being harmless to the ultimate disposition of the trial, as follows:

[ . . . ]

First, appellant has not preserved this contention for appeal because he made no confrontation clause objection in the trial court. When a defendant objects on hearsay grounds to the admission of evidence, but does not also raise a confrontation clause objection, and the trial court properly admits that evidence under the hearsay exception, the defendant cannot argue on appeal that the evidence properly admitted under the hearsay exception nevertheless violates the confrontation clause. (*People v. Loy* (2011) 52 Cal.4th 46, 66, fn. 3; *see also People v. Redd* (2010) 48 Cal.4th 691, 730.)

Second, even if we were to address the argument on its merits, it would fail. In *Crawford v. Washington* (2004) 541 U.S. 36, the court held that the confrontation clause permits admission into evidence "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id*. at p. 59; *in accord, see also Bullcoming v. New Mexico* (2011) ——U.S. ——, [131 S. Ct. 2705, 2706–07].) [ . . . ]

[ . . . ] [I]n *Davis v. Washington* (2006) 547 U.S 813, [ ] the court stated: "Without attempting to produce an exhaustive classification of all conceivable statements -- or even all conceivable statements in response to police interrogation -- as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

(*Id*. at p. 822, fn. omitted.)

[ . . . ]

Third, even if appellant had not waived the confrontation clause issue, and even if we were to be incorrect in our conclusion that that Saucedo's statements to Faiman were not testimonial, we are still of the opinion, for the reasons stated in subpart "D" above, that any error in the admission of those statements was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)  [ . . . ]

(LD 13, pp. 21-24.)

## 2.    Analysis

Respondent contends that Petitioner's confrontation clause argument is procedurally barred because the purported error was not preserved at trial by a contemporaneous objection, as evidenced by the Court of Appeal's rejection of the claim as procedurally defaulted.  (Doc. 14, pp. 18-19.)  The undersigned agrees, and further finds that the state court's analysis applied the correct standard and reached an objectively reasonable conclusion, and that any error was harmless.  As a result, habeas relief should be denied.

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'"  *Fenenbock v. Director of Corrections for Cal.*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).

In *Crawford*, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable.  *Crawford*, 541 U.S. at 124. The Crawford rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements.  *Id*. at 42, 51, 68.  *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement").

Although the Crawford court declined to provide a comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52. The court also provided the following "formulations" of a "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51-52. The court in *Crawford* also pointed out that the Sixth Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59, n.9. However, "state evidence rules do not trump a defendant's constitutional right to confrontation," and a reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate, nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the Confrontation Clause's application." *Williams v. Illinois*, 132 S. Ct. 2221, 2226 (2012).

### a.    Procedural Bar

Respondent first argues that Petitioner's confrontation clause argument is procedurally barred because the purported error was not preserved at trial by a contemporaneous objection, as evidenced by the Court of Appeal's rejection of the claim as procedurally defaulted. The undersigned agrees.

State courts may decline to review a claim based on a procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001); *see Ylst*, 501 U.S. at 801; *Park v. California*, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach

the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements. . . ."); *see also Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935).  This concept has been commonly referred to as the procedural default doctrine.  This doctrine of procedural default is based on concerns of comity and federalism.  *Coleman*, 501 U.S. at 730-32.  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."  *Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir. 1993); *Coleman*, 501 U.S. at 750; *Park*, 202 F.3d at 1150.

For the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.  *Ylst*, 501 U.S. at 801; *Coleman*, 501 U.S. at 729-30; *see also Fox Film Corp.*, 296 U.S. at 210.  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  *LaCrosse*, 244 F.3d at 704 (*citing Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)); *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law'") (*quoting Coleman*, 501 U.S. at 735)).  "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'"  *Park*, 202 F.3d at 1152 (*quoting Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied.  *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court") (*quoting Ford v. Georgia*, 498 U.S. 411, 424 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'"  *Id.* at

377 (*quoting Morales*, 85 F.3d at 1392).

California law requires, with certain exceptions, that appellate courts not consider claims of error that could have been but were not raised in the trial court. *Peole v. Vera*, 15 Cal. 4th 269, 275 (1997). That rule has been deemed both independent of federal law, *People v. Williams*, 16 Cal. 4th 153, 208 (1997), and consistently applied, *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002). Here, the record establishes, and Petitioner does not dispute, that defense counsel failed to tender a timely objection to the introduction of Saucedo's spontaneous statement to Officer Faiman; hence, the state court's determination that the claim has been procedurally defaulted bars federal review in this case.

### b.    Merits

As mentioned previously, state court rulings on the admissibility of evidence generally are not within the scope of federal habeas review. *Estelle*, 502 U.S. at 67-68. Therefore, Petitioner could not obtain federal habeas relief on a claim that the California courts wrongly found that Saucedo's statements to Officer Faiman fell within California's spontaneous statement exception to the hearsay rule. However, where a petitioner alleges a Confrontation Clause violation, a federal habeas court must independently analyze whether a state court decision that statements fall or do not fall within a firmly rooted exception to the hearsay rule have a factual basis in the record. *Winzer v. Hall*, 494 F.3d 1192, 1199 (9th Cir. 2007) ("in sum, even under AEDPA, we cannot avoid the question of whether a hearsay statement falls within a firmly rooted exception to hearsay and so complies with the Confrontation Clause"). Accordingly, the undersigned must independently analyze the record to determine whether a sufficient factual basis supports the state court's conclusion that Saucedo's statements to Officer Faiman were spontaneous declarations and therefore not subject to exclusion under the hearsay rule. *See Winzer*, 494 F.3d at 1199-1201. A sufficient factual basis supporting the state court's conclusion on this issue exists within the record.

Here, the Fifth DCA applied the correct legal standard under the Sixth Amendment by applying *Crawford*, *Davis*, and *Michigan v. Bryant*, 562 U.S. 344 (2010). Thus, the only question remaining is whether the Fifth DCA's adjudication is objectively unreasonable.

The Fifth DCA conducted a thorough examination of the evidence and circumstances described by that evidence at the time of the shooting and the elicitation of Saucedo's spontaneous statements by Faiman immediately thereafter to conclude that the statements were not testimonial and thus not covered by the Sixth Amendment.  To briefly summarize, the state court did not concern itself with Saucedo's statement to Faiman that "[Saucedo] was the victim and that they had just been shot at," but instead focused only on the statements that an individual in the passenger seat of the brown vehicle shot at him and that the individual was a member of a rival gang.  The chronology of events strongly suggests that, during the initial encounters with Faiman, which occurred shortly after the shooting took place, Saucedo was "upset," "nervous," and "excitable."  After several more minutes had passed, during which officers were attempting to elicit basic information such as names, birthdates, and identifying information, Saucedo refused to cooperate further with Faiman.  The Fifth DCA construed this to be the point at which the initial "excitement" of Saucedo's original utterances to Faiman had worn off and Saucedo's "reflective powers" had engaged such that he had begun to "calculate" what to say to police and what not to say.  The state court viewed that point as the cut-off point after which the excited utterance exception would no longer apply.

The Fifth DCA's legal analysis appears to be amply supported by evidence in the record. Therefore, the Fifth DCA's findings and legal determination regarding the applicability of the excited utterance rule should be upheld.  *See Winzer*, 494 F.3d at 1199-1201

Turning to the issue of the confrontation clause claim, the state court relied upon *Davis*, which explained that "[s]tatements are nontestimonial when made in the court of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  *Davis*, 547 U.S. at 822.  Similarly, in *Bryant*, upon which the state court also relied, the Supreme Court concluded that statements from a dying victim to police that "Rick shot me" were nontestimonial because the primary purpose of the interrogation was to enable the police to meet an ongoing emergency, not to establish or prove past events germane to a possible later criminal prosecution.  *Bryant*, 562 U.S. at 374-375.

1    The Fifth DCA concluded that the comments made by Saucedo, which occurred at the

2    outset of Faiman's investigation, were elicited by Faiman for the primary purpose of conducting

3    an initial investigation into what had transpired, to determine if other individuals might be in

4    danger, and whether the individuals who had fired the shots were the individuals Faiman had

5    detained or were persons unknown and still at large and posing a danger to public safety.  Under

6    such circumstances, it is apparent that the primary purpose of questioning Saucedo initially was

7    not to gather information for a future prosecution but simply to secure the scene and assess

8    whether the danger persisted.  As such, the comments were not testimonial and do not invoke the

9    Confrontation Clause.

10    Thus, the Fifth DCA's analysis applied the correct standard and made a thoughtful

11    analysis of the issue based upon that standard that reach an objectively reasonable conclusion.

12    That is all that is required under the AEDPA.  As a result, habeas relief should be denied.

13                    **c.      Harmless Error**

14    The undersigned also agrees with the Fifth DCA that any error was harmless.  The Fifth

15    DCA concluded that even if admission of the Saucedo hearsay statements to Faiman were

16    erroneous, the error was harmless beyond a reasonable doubt pursuant to *Chapman v. California*,

17    386 U.S. 18 (1967).  Under the AEDPA, a constitutional error in a state court criminal trial is

18    assessed under the "substantial and injurious effect" standard set forth in *Brecht*, 507 U.S. 619,

19    637, even if the state court recognized the error and reviewed it for harmlessness under the

20    "beyond a reasonable doubt" standard of *Chapman*.  *Fry v. Pliler*, 551 U.S. 112 (2007).  When

21    the state court applies the *Chapman* standard, that court's determination is subject to the

22    deferential review afforced by sec. 2254(d)(1).  Because the *Brecht* test subsumes the sec.

23    2254(d)(1)/*Chapman* test, the federal district court need only apply the *Brecht* test.  *Fry*, 551 U.S.

24    at 120 ("it certainly makes no sense to require formal application of *both* tests . . . when the latter

25    obviously subsumes the former").

26    The Fifth DCA concluded that several witnesses at trial could be understood to have

27    testified that the shots were fired from the Cougar in which Petitioner was riding, not from some

28    other car or unknown pedestrian.  Given this evidence, contrary to Petitioner's contention,

19

1   Saucedo's statement was *not* the only evidence connecting Petitioner to the crime. Moreover, the

2   jury was free to reject the testimony of defense witness Ms. Ochoa, who stated that immediately

3   after the shots were fired, she saw youths running into an alley, or to understand her testimony

4   simply as youths running away from the perceived danger. Simply put, there is *no* credible direct

5   evidence that anyone other than riders in the Cougar fired shots at the victims. Accordingly,

6   Saucedo's testimony was cumulative and its admission did not have a substantial and injurious

7   effect on the verdict.

8   **C.      Ineffective Assistance of Trial Counsel**

9       Petitioner next claims he was denied the effective assistance of counsel when his attorney

10  failed to object to the admission of Saucedo's statement to Officer Faiman. This contention is

11  without merit.

12      **1.      The Court of Appeal's Opinion**

13      The Fifth DCA rejected Petitioner's claim as follows:

> Appellant contends that he was denied effective assistance of counsel because his trial counsel failed to object on Sixth Amendment grounds (as opposed the hearsay objection that trial counsel did raise) to the admission of Saucedo's statements to Officer Faiman. This argument fails for at least two reasons. First, appellant fails to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. As we have explained, Saucedo's statements to Faiman were not "testimonial" and thus were not barred by the confrontation clause of the Sixth Amendment. (*Michigan v. Bryant, supra*, 131 S.Ct. 1143). An objection on Sixth Amendment grounds would thus have been without merit. Second, as we have also already explained, even if Saucedo's statements were to be considered "testimonial," the admission of his statements was harmless beyond a reasonable doubt.

21  (LD 13, p. 25).

22      **2.      Analysis**

23      Respondent contends the state court reasonably determined Petitioner's trial counsel acted

24  objectively reasonably and therefore was not ineffective. (Doc. 14, pp. 20-23.) The undersigned

25  agrees.

26      The purpose of the Sixth Amendment right to counsel is to ensure that the defendant

27  receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel

28  is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14

(1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

Here, the state court identified the appropriate federal standard by applying *Strickland*. Thus, the only issue is whether the state court's adjudication, *i.e.*, that defense counsel's representation was neither deficient nor prejudicial, was not contrary to or an unreasonable application of *Strickland*.

The Fifth DCA ruled that neither prong of the *Strickland* standard had been met. The Court agrees. First, as the Fifth DCA noted, and this Court has affirmed, Saucedo's comments were not testimonial in nature and, therefore, were not barred by the Confrontation Clause. Thus, Petitioner's counsel had no legal basis for interposing an objection to the admission of the Saucedo hearsay. Following this reasoning to its logical conclusion, defense counsel could not have been derelict in his performance for failing to interpose an objection that lacked a valid legal basis. Moreover, as the Fifth DCA concluded, and this Court has affirmed, any error in admitting the Saucedo hearsay was harmless under *Brecht*; hence, the *Strickland* "prejudice" prong is not met. Because neither prong of *Strickland* has been met in this case to demonstrate Petitioner's trial counsel was ineffective, Petitioner's claim should be denied.

//

**D.     Trial Court's Admission of Saucedo's Statements to Stephanie G.**

Petitioner next contends that the trial court erred in admitting the statement of witness Saucedo to Stephanie G. as a spontaneous statement exception to the hearsay rule.   This contention is without merit.

### 1.      The Court of Appeal's Opinion

The Fifth DCA rejected Petitioner's claim as follows:

> Appellant contends the trial court erred in admitting Stephanie G.'s testimony that Saucedo told her that while he was in the store, one of the occupants of the Cougar said to him "What's up, Ene[?]" and he responded, "What's up, Ese[?]"
>
> Even if we assume, without deciding the issue, that this evidence was improperly admitted, any error in admitting the statement was clearly harmless.  (*See* part "I," subpart "D" of this opinion, *ante*.)  As we have already pointed out, the evidence presented at trial included statements from all three occupants of the Maxima that shots were fired at them from the Cougar.  Even if we were to assume that Juan Saucedo's statements to Officer Faiman (including Saucedo's statement that the Cougar "blasted" him were improperly admitted, as appellant contends, we are still left with the statements from Rodriguez and Stephanie G. about the shooting, about the "mad dogging" at the gas station prior to the shooting, the video showing Saucedo and Zuniga inside the store together and obviously aware of each other, the uncontradicted evidence that the "LA" tattoo on the back of Saucedo's head made him easily identifiable as a gang member (he entered the store ahead of Zuniga), the lack of any testimony from anyone that there was any gun anywhere other than in the Cougar, a lack of any alibi evidence as to where the defendants were when the shots were fired at the Maxima, and no attempt from the defense to explain why the Cougar, registered to appellant, was burned 4 days after the shooting.
>
> Appellant's argument that admission of hearsay evidence of the "Ene . . . Ese" exchange between Zuniga and Saucedo violated appellant's constitutional right to confront the witnesses against him fails because, as we explained in part "I," subpart "E," *ante*, that Sixth Amendment right protects a defendant only from the improper admission of testimonial hearsay.  (*Crawford v. Washington, supra*, 541 U.S. 36.)   A statement made to an acquaintance at a gas station is not "testimonial" evidence.  (*People v. Griffin* (2004) 33 Cal. 4th 536, 579; *People v. Loy, supra*, 52 Cal.4th at p. 66.)

(LD 13, pp. 25-26.)

### 2.      Analysis

As with Petitioner's claim regarding Saucedo's spontaneous statement to Officer Faiman, Petitioner does not allege that the adjudication of his claims in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

1   . . . or resulted in a decision that was based on an unreasonable determination of the facts . . . ."

2   28 U.S.C. § 2254.  Petitioner raises only a state law claim, and, as discussed above at length,

3   issues of state law are not cognizable on federal habeas review.  *Estelle*, 502 U.S. at 67 ("We

4   have stated many times that 'federal habeas corpus relief does not lie for errors of state law'")

5   (*quoting Lewis*, 497 U.S. at 780); *Gilmore*, 508 U.S. at 348-49 (1993) (O'Connor, J., concurring)

6   ("mere error of state law, one that does not rise to the level of a constitutional violation, may not

7   be corrected on federal habeas").  This Court is bound by the state court's ruling regarding its

8   interpretation of its own evidentiary rules, and therefore Petitioner's claim for habeas relief due to

9   the admission of Saucedo's spontaneous statements to Stephanie G. should be denied.  *Oxborrow*,

10  877 F.2d at 1399; *see also Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990), *cert. denied*, 498

11  U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief).

12         Further, as the Fifth DCA found, Saucedo's informal statement to Stephanie G., made

13  while the two of them were at the gas station after Saucedo had first encountered a rival gang

14  member, were not testimonial under *Crawford*.  *See, e.g., Giles*, 554 U.S. at 376 ("Statements to

15  friends and neighbors . . . would be excluded, if at all, only by hearsay rules. . . ."); *Crawford*, 541

16  U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in

17  a sense that a person who makes a casual remark to an acquaintance does not"); *Delgadillo*, 527

18  F.3d at 927 (victim's statements to her coworkers were nontestimonial and did not implicate

19  petitioner's Sixth Amendment right of confrontation).   Therefore, "because [Saucedo's]

20  statements to [Stephanie G.] were not 'testimonial,' their admission in [Petitioner's] trial was not

21  precluded by *Crawford*."  *Jensen v. Pliler*, 439 F.3d 1086, 1090 (9th Cir. 2006).

22         Even if admission of the excited utterance were erroneous, the error was harmless under

23  *Brecht*.  The state court characterized the evidence of Petitioner's involvement in the shooting as

24  substantially corroborated by three eyewitnesses and additional circumstantial evidence.  Under

25  those circumstances, it is difficult to see how Saucedo's statement that the two rival gang

26  members exchanged coded messages about their gang affiliations at the gas station could possibly

27  have had a "substantial and injurious effect" on the verdict.  Out of context, the statements were

28  meaningless to lay people not versed in gang protocols.  In context, they serve only to reinforce

the established fact of respective gang affiliations, something with which the jury was already quite familiar.  Accordingly, the error, if any, would have been harmless under *Brecht*.

**E.     Reference to Petitioner's Juvenile Record at Trial**

Petitioner next contends that he was denied a fair trial because the jury was improperly exposed to evidence that he was in California Youth Authority.  This contention is without merit.

**1.     The Court of Appeal's Opinion**

The Fifth DCA rejected Petitioner's claim as follows:

A.     Facts

Officer Solis testified that during her search of appellant's bedroom at the Amber Street residence she located, *inter alia*, what the prosecutor marked as People's Exhibit 47.  Solis described that exhibit as "court paperwork with the name of Richard Larios on it I collected."  When asked to describe a photograph included in those documents, Solis said, "This is a picture with Richard Rodriguez Larios and the date of birth of 3-9-88, a YA picture."  Appellant's counsel's attempted objection was interrupted by Zuniga's counsel's objection to the "reference to the YA reference.  She indicated it was a YA picture."  The court sustained the objection and struck "[t]hat portion, the YA picture."  Solis then identified the person in the photo as appellant.

During the lunch recess, appellant moved for a mistrial, explaining, "There is no indication in the prior testimony [during appellant's first trial] that she was gonna pop up saying that Mr. Larios was in YA and that's a common term that certainly anybody would know and it's, it's extremely prejudicial for the jury to know, to know or believe that Mr. Larios has previously served time in, in YA."  The court denied appellant's mistrial motion, doubting that any juror would understand the reference to YA and therefore concluding the reference was not prejudicial to appellant.  The court, however, offered to voir dire each juror as to whether YA had any significance to him or her.

After the lunch recess, counsel asked the court to reconsider its ruling denying his mistrial motion, arguing that polling the jury on the meaning of YA would only make the jurors curious as to what was being excluded.  The court agreed not to question the jurors and indicated it would instruct the jurors not to consider stricken evidence.

When the jurors returned, the court instructed them not to consider the stricken portion of Solis's reference to the photograph.

The parties later agreed that in lieu of appellant's YA photograph, the prosecutor would introduce a DMV photograph found in appellant's bedroom.

//

//

24

B.      The Law

"A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

C.      Analysis

Applying this standard, we cannot say that the trial court abused its discretion. The trial court was probably correct that a typical juror would not know what "YA" stood for. The picture itself has been made part of the record on appeal. At the top of the picture is appellant's name, his date of birth, and the letters "Loc NACYCF." At the bottom of the picture is "YA#" followed by a 5-digit number, and "Photo Date 12/05/07." In the picture, which shows appellant from the mid-chest area to the top of his head, he is wearing what appears to be a white tee shirt. After appellant moved for a mistrial, the prosecutor told the court that this same photo had been admitted into evidence at appellant's first trial. Thus, we know that appellant's first jury saw the photo with the letters "YA" on it and did not convict appellant. Defense counsel presumably expected that the prosecution would attempt to admit the photo again, but the record contains no motion in limine by the defense attempting to keep the photo out of evidence. Although we realize that it is the effect of the evidence on the jury that matters, and not the intent of the witness giving the testimony, calling the document a "YA photo" is certainly a reasonable brief description of it.

[ . . . ]

Furthermore, as previously noted, the court instructed the jury to disregard Solis's testimony about the photo. "We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal. 3d 612, 689, fn.17; *in accord, see also People v. Carey* (2007) 41 Cal. 4th 109, 130, and *People v. Curl* (2009) 46 Cal. 4th 339, 357, fn.13.) Under these circumstances, we cannot conclude that the court abused its discretion in denying appellant's motion for a mistrial.

(LD at pp. 26-29.)

**2.      Analysis**

Respondent contends that regardless of whether the trial court improperly instructed the jury to disregard Solis' prejudicial reference to "YA" rather than direct a mistrial, there is no Supreme Court authority clearly establishing the admission of irrelevant or prejudicial evidence

1   violates due process.  (Doc. 14, pp. 26; 33.)  The undersigned agrees.

2          Simple errors of state law do not warrant federal habeas relief.  *Estelle v. McGuire*, 502

3   U.S. 62, 67 (1991).  "The issue for us, always, is whether the state proceedings satisfied due

4   process; the presence or absence of a state law violation is largely beside the point."  *Jammal v.*

5   *Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).  "The admission of evidence does not

6   provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of

7   due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-

8   68); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). (issues regarding the admission

9   of evidence are matters of state law, generally outside the purview of a federal habeas court).  *See*

10  *also Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("the Due Process Clause does not

11  permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary

12  rules").

13         Under AEDPA, even clearly erroneous admissions of evidence that render a trial

14  fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by

15  "clearly established Federal law," as laid out by the Supreme Court.  *Yarborough*, 568 F.3d at

16  1101 (citing 28 U.S.C. § 2254(d)).  In cases where the Supreme Court has not adequately

17  addressed a claim, a reviewing district court cannot use its own precedent to find a state court

18  ruling unreasonable.  *Id.* (citing *Musladin*, 549 U.S. at 77).

19         The Supreme Court has made very few rulings regarding the admission of evidence as a

20  violation of due process.  Although the Court has been clear that a writ should be issued when

21  constitutional errors have rendered the trial fundamentally unfair, *see Williams*, 529 U.S. at 375, it

22  has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

23  constitutes a due process violation sufficient to warrant issuance of the writ.  Petitioner has cited

24  *no* "clearly established Federal law" to demonstrate that reference to a "YA photograph" was so

25  irrelevant or overtly prejudicial as to constitute a due process violation.  Absent such "clearly

26  established Federal law," the Court is unable to conclude that the state court's ruling was an

27  "unreasonable application" of "clearly established federal law."  *Musladin*, 549 U.S. at 77.  Under

28  the strict standards of AEDPA, the reference to "YA" during the trial -- *even if were clearly*

*erroneous* -- cannot warrant issuance of the writ.  *Yarborough*, 568 F.3d at 1101.

### F.       Cumulative Error

Finally, Petitioner contends that the cumulative effect of all claimed errors violated his federal constitutional right to a fair trial.  This contention is also without merit.

#### 1.       The Court of Appeal's Opinion

The Fifth DCA rejected Petitioner's claim as follows:

[ . . . ]

> Appellant contends that the cumulative effect of the purported errors addressed in parts "I" through "III" above deprived him of a fair trial.  As we have explained, those contentions of error are without merit.  Also, for the reasons we have already explained above, even if appellant's contentions of error had merit, the cumulative prejudicial effect of the presumed errors was harmless under any standard.

(LD, p. 29.)

#### 2.       Analysis

The cumulative prejudicial effect of multiple trial errors must be considered in determining whether habeas relief is warranted.  28 U.S.C. § 2254.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001).  In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue harmless error review." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Whelchel v. Washington*, 232 F.3d 1197, 1124 (9th Cir. 2000)(noting that cumulative error applies on habeas review); *Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir. 1984) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant."  *Ceja v. Stewart*, 97 F. 3d 1246, 1254 (9th Cir. 1996), citing *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992).  "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of

the due process right to a fair trial." *Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. *See Rup v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996). Respondent contends, however, that there are no constitutional errors to accumulate in this case. *See Villafurerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (per curiam). The Court agrees.

As discussed herein, no Confrontation Clause violation has been established and no violation of state evidentiary rules relative to spontaneous utterances has been shown concerning Saucedo's statements to Officer Faiman and to Stephanie G., no ineffectiveness of trial counsel has been proven, Petitioner's trial was not rendered fundamentally unfair by the reference to "YA", and regardless, any errors would have been harmless given the state of the evidence. Accordingly, without *any* established constitutional errors to accumulate, there can be no cumulative error.

## G.   Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the
>
> United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B)  the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Id.* at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court declines to issue a certificate of appealability.

## V.        Conclusion and Recommendations

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District

//

//

//

//

Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 31, 2016**                                          **/s/ Sheila K. Oberto**
UNITED STATES MAGISTRATE JUDGE